UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| THOMPSON THRIFT DEVELOPMENT, INC., <br> WATERMARK AT PEORIA AZ, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE CINCINNATI INSURANCE COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) No. 2:23-cv-00140-JPH-MG |

**ORDER GRANTING CINCINNATI'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs—Watermark at Peoria AZ, LLC and Thompson Thrift Development, LLC (together, "Thompson Thrift")—own and manage an apartment complex in Peoria, Arizona that was contaminated with toxic chemicals and required remediation. Thompson Thrift has filed a motion for summary judgment on liability, seeking a determination that its insurance policy from The Cincinnati Insurance Company covers the costs Thompson Thrift incurred responding to the contamination. Dkt. [56]. Cincinnati has filed a cross-motion for summary judgment. Dkt. [68]. For the reasons below, Cincinnati's motion is **GRANTED** and Plaintiffs' is **DENIED**.

**I.
Facts and Background**

The parties have filed cross-motions for summary judgment, so the Court takes the motions "one at a time." *Am. Fam. Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016). For each motion, the Court views and recites the

1

evidence and draws all reasonable inferences "in favor of the non-moving party." *Id.* That's not necessary here, however, because even when all evidence is interpreted in Thompson Thrifts' favor, Cincinnati is entitled to summary judgment.

In 2017, Thompson Thrift purchased property in Peoria, Arizona that it later developed into an apartment complex called the Grandstone at Sunrise. Next door was a drycleaning business, Lake Pleasant Cleaners. Dkt. 56-4 at 18, 140.

In 2022, environmental sampling showed a high concentration of the toxin perchloroethylene (PCE) on the Grandstone property. Dkt. 56-4 at 43, 52–54; dkt. 56-3 at 27–28. PCE is a used in drycleaning, but Thompson Thrift was unsure if Lake Pleasant Cleaners was the source of the contamination. Dkt. 56-4 at 51. Given the "history of indiscriminate dumping of hazardous substances, including PCE, on vacant desert land in and around Phoenix," Thompson Thrift was concerned that the Grandstone property itself could be the source of the PCE. Dkt. 56-6 at 13.

Thompson Thrift then performed additional sampling at Grandstone. Dkt. 56-4 at 73–79. This included air sampling inside vacant Unit 1061, which showed PCE concentrations at levels that posed a risk to human health. *Id.* at 76–77. The sampling report did not identify a source of the PCE contamination. *See id.* at 73–79.

On June 17, 2022, Thompson Thrift submitted a notice of claim to Cincinnati saying that "tests have confirmed the presence of [PCE]." Dkt. 56-4

2

at 63–65.  Cincinnati responded by asking to be informed immediately if Thompson Thrift received any third-party claim or notice from any governmental agency.  Dkt. 56-4 at 69.

     A week later, Thompson Thrift informed Cincinnati that it would report the PCE contamination to the Arizona Department of Environmental Quality (ADEQ), as Arizona law required, and inform the property's tenants.  *Id.* at 70–71; Ariz. Rev. Stat. § 49-284.  One tenant asked for her apartment, Unit 1026, to be tested, which showed elevated levels of PCE.  Dkt. 56-3 at 50–53.  That tenant then requested to be let out of her lease and have Thompson Thrift cover her moving expenses.  Dkt. 56-4 at 91.  Unit 1026 was on the opposite side of the property from Lake Pleasant Cleaners, increasing Thompson Thrift's concern that Lake Pleasant Cleaners was not the only source of PCE contamination.  Dkt. 56-5 at 78–79.

     An ADEQ Section Manager later confirmed with Thompson Thrift that Unit 1061 would remain vacant due to the high PCE levels:

> [P]er our conversation ADEQ appreciates your clients organizations assistance in keeping the unit unoccupied in light of the detected vapors in the report while ADEQ pursues legal investigations.

Dkt. 56-4 at 94 (October 2022 email); *see* dkt. 56-6 at 13–14.  Thompson Thrift viewed this as a "soft command" to keep the unit vacant, and that it was an "implication . . . that if we don't do this, then . . . there [was] a whole host of things" ADEQ could do, including shutting down other units.  Dkt. 56-3 at 54–55.

ADEQ requested the results of Thompson Thrift's environmental tests into the following year, including in June 2023 when ADEQ requested data "ASAP" from testing it knew Thompson Thrift was doing. *Id.* at 83; dkt. 59-1 at 41–43. That sampling continued to show PCE "in significant concentrations." Dkt. 59-1 at 41. Thompson Thrift's environmental consultant testified that Arizona typically ran its investigations this way, by allowing engaged parties to perform testing and share that data, rather than by prescribing exact steps that needed to be taken. Dkt. 56-5 at 103–04.

In December 2023, both Thompson Thrift and Lake Pleasant Cleaners' landowner enrolled in ADEQ's Joint Voluntary Remediation Program (VRP). Dkt. 56-4 at 147–64; dkt. 59-2 at 6–7.

Thompson Thrift was insured through commercial general liability (CGL) and umbrella policies from Cincinnati. Dkt. 56-1. Cincinnati has not provided a defense or indemnification regarding any of Thompson Thrift's efforts to address PCE on the property. *See* dkt. 34 at 14. Each of the CGL policies provided that Cincinnati:

> [W]ill pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

Dkt. 56-1 at 64, 311, 1864. The policies defined "suit" as:

> [A] civil proceeding in which money damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

4

      a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;
      b. Any alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or
      c. An appeal of a civil proceeding.

Dkt. 56-1 at 82–83, 329–30, 1882–83, 7849–50, 9201–02.

The umbrella policies additionally state that Cincinnati:

[W]ill pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies:
      a. Which is in excess of the "underlying insurance"; or
      b. Which is either excluded or not insured by "underlying insurance."

Dkt. 56-1 at 128, 384, 1942, 7923.

Thompson Thrift brought this case in Indiana state court, and Cincinnati removed it to this Court in March 2023. Dkt. 1. Thompson Thrift moved for summary judgment on liability, requesting determinations that the Cincinnati policies provide defense and indemnity coverage, and that Cincinnati breached the policies. Dkt. 62. Cincinnati filed a cross-motion for summary judgment. Dkt. 68.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.*

5

*v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

In ruling on cross motions for summary judgment, the Court takes the motions "one at a time," viewing and reciting the evidence and drawing all reasonable inferences "in favor of the non-moving party."  *Williams*, 832 F.3d at 648.  The parties agree that Indiana law applies.  Dkt. 62 at 11; dkt. 69 at 18.  Absent a controlling decision from the Indiana Supreme Court, the Court does its best to predict how that court would rule on the issues of law.  *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021).  In doing so, the Court may consider decisions from the Indiana Court of Appeals.  *See id.*

### III.
### Analysis

#### A. Duty to defend

Under the CGL policies, Cincinnati has the "duty to defend" Thompson Thrift "against any 'suit'" seeking covered damages.  Dkt. 56-1 at 64, 311, 1864, 8197.  Cincinnati argues that it's entitled to summary judgment because there was no "suit" against Thompson Thrift that triggered the duty to defend.  Dkt. 69 at 19–20.  Thompson Thrift responds that the "ADEQ's demands were sufficiently 'coercive'" to qualify as a suit.  Dkt. 62 at 29.

Indiana law has interpreted "suit" to include both "actual" lawsuits and "coercive and adversarial administrative proceedings."[1]  *Hartford Acc. & Indem.*

---

[1] The Indiana Court of Appeals recently described the "plain and ordinary meaning of the word, 'suit'" as "an action or process *in a court* for the recovery of a right or claim."

*Co. v. Dana Corp.*, 690 N.E.2d 285, 294–96 (Ind. Ct. App. 1997).  To qualify as a "suit," the proceeding "must [involve] some cognizable degree of coerciveness or adversariness" or a "substantial entry-level burden" of coercion.  *Id.* at 294–96.  "Less coercive actions"—such as "mere notification or investigation when no enforcement action is contemplated"—"do not rise to the level of 'suit.'"  *Id.* at 296–97; *see Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 934 (Ind. Ct. App. 1999).

In *Dana*, the Indiana Court of Appeals held that administrative proceedings were a "suit" under this standard when the insured had received a letter from the EPA identifying it as potentially responsible for contamination "coupled with a specific allegation of liability."  *Dana*, 690 N.E.2d at 296.  Cases applying *Dana* agree that an administrative proceeding is a "suit" when there is an immediate threat of liability or enforcement actions.  *See Am. Chem. Serv., Inc. v. U.S. Fid. & Guar. Co.*, 2015 WL 1524590, at *6–7 (N.D. Ind. Apr. 2, 2015) (notification of potential liability and penalties, with a formal demand for reimbursement and explanation how to negotiate a settlement and cooperate, qualified as a "suit"); *1100 W., LLC v. Red Spot Paint & Varnish Co.*, 2008 WL 623178, at *10–11 (S.D. Ind. Mar. 4, 2008) (letter identifying insured "as a potentially responsible party" and requesting "a proposal for remedial action" qualifies as a "suit"); *Gov. Interinsurance Exch. v. City of Angola, Ind.*, 8 F.

---

*Global Caravan Techs., Inc. v. Cincinnati Ins. Co.*, 135 N.E.3d 584, 591 (Ind. Ct. App. 2019) (emphasis added).  The Court assumes without deciding that Thompson Thrift is correct that *Dana*'s broader definition applies in environmental cases like this one.  *See* dkt. 62 at 28.

Supp. 2d 1120, 1131 (N.D. Ind. 1998) ("directions from [the agency] on precisely how to proceed in cleaning up the . . . site," with a warning of formal enforcement action qualified as a "suit").

    Here, Thompson Thrift has designated evidence that it interpreted ADEQ's actions as an implicit threat of formal enforcement action. *See* dkt. 56-5 at 89. ADEQ had told Thompson Thrift that it "appreciates [Thompson Thrift's] assistance in keeping [Unit 1061] unoccupied" in light of the contamination. Dkt. 56-4 at 106–110. And ADEQ had met with Thompson Thrift and its consultants, with requests to provide their findings and data. Dkt. 56-6 at 13–14; dkt. 59-1 at 42–43. So Thompson Thrift was concerned that, if it did not cooperate, ADEQ would inspect and shut down more units and impose "a host of repercussions." Dkt. 56-3 at 54–55; dkt. 62 at 30.

    There is no designated evidence, however, that ADEQ told Thompson Thrift that it faced liability, formal enforcement actions, or civil penalties for not complying with ADEQ's requests. *See* dkt. 56-5 at 58–59 (Thompson Thrift's characterizing ADEQ's communications as "indirect subtle pressure"). While Thompson Thrift calls ADEQ's communications about Unit 1061 a "keep vacant order," ADEQ called it an "investigation," dkt. 56-4 at 94, and there is no designated evidence that there was an administrative order or "formal demand" that could subject Thompson Thrift to liability. Dkt. 62 at 31; *see Am. Chem. Serv., Inc.*, 2015 WL 1524590, at *6. Similarly, ADEQ's requests for data from Thompson Thrift's testing is the type of information gathering expected in an ongoing "investigation," rather than a formal proceeding aimed

8

at legal liability.  See dkt. 59-1 at 42; *Dana*, 690 N.E.2d at 296–97 (A "mere . . . investigation" does not constitute a "suit.").

Moreover, Thompson Thrift's "goal" was to avoid imposed liability—"to make sure that ADEQ [was] satisfied" so it would "not pursue anything further."  Dkt. 62 at 31–32.  That too indicates that ADEQ did not proceed past the type of "mere notification or investigation when no enforcement action is contemplated" that is not a "suit" under Indiana law.  *Dana*, 690 N.E.2d at 296–97.[2]  Indeed, the cases that Thompson Thrift relies on included an allegation of liability or threat of formal enforcement that is missing from the designated evidence here.  See *id.* at 296 (requiring "coercive and adversarial administrative proceedings" for a "suit"); *Gov. Interinsurance Exch.*, 8 F. Supp. 2d at 1131 (same); *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 662 F. Supp. 71, 75 (E.D. Mich. May 18, 1987) (applying Michigan law and holding "that a 'suit' includes any effort to impose on the policyholders a liability ultimately enforceable in court").

Next, Thompson Thrift argues that its participation in the VRP is a "suit." Dkt. 62 at 33.  It relies on *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp.*, in which the Indiana Court of Appeals held that participation in *Indiana's* VRP constituted a "suit."  917 N.E.2d 170, 175 (Ind. Ct. App. 2009).

---

[2] Thompson Thrift also relies on cases applying Oregon and Minnesota law to argue that ADEQ's request to be kept updated qualified as a "suit."  Dkt. 62 at 32–33 (citing *Ash Grove Cement Co. v. Liberty Mut. Ins.*, 649 Fed. App'x 585, 588 (9th Cir. 2016) (unpublished); *Wrestling Mfg. Co. v. Western Nat'l Mut. Ins.*, 581 N.W.2d 39, 47 (Minn. Ct. App. 1998)).  But Thompson Thrift does not cite analogous Indiana-law cases or explain why information requests go beyond the "mere notification or investigation" that is not a "suit."  *Dana*, 690 N.E.2d at 296–97.

But *Standard Fusee* was vacated when the Indiana Supreme Court granted transfer in the case, 940 N.E.2d 810 (Ind. 2010), so it is "held for naught and has no precedential value," even as "persuasive authority,"[3] *Szamocki v. Anon. Doctor and Anon. Grp.*, 70 N.E.3d 419, 428 n.4 (Ind. Ct. App. 2017). Even if it could be considered, *Standard Fusee* relied on requirements in Indiana's VRP program that could subject the insured "to enforcement actions and potential civil penalties." 917 N.E.2d at 186. Here, by contrast, Thompson Thrift enrolled in the VRP to pursue a "no further action" determination that would "clear [itself] of ADEQ," which is inconsistent with its argument that it faced coercive action in the VRP process. Dkt. 56-3 at 68–70.

Last, Thompson Thrift contends that the tenant's demand to be let out of her lease in Unit 1026 qualifies as a "suit." Dkt. 75 at 17. But Thompson Thrift does not allege that the tenant's demand exposed it to enforcement actions or civil penalties, or that there was any measure of coercion involved. And so for the same reasons as discussed above, this lease issue cannot qualify as a "suit" under Indiana law either.

In sum, taking the designated evidence in the light most favorable to Thompson Thrift, ADEQ's process and the tenant's demand to be let out of her

---

[3] Thompson Thrift appears to resist this conclusion by arguing that "the Indiana Supreme Court explicitly noted it was not reversing the Indiana Court of Appeals decision on the issue of 'suit.'" Dkt. 62 at 33 n.9 (citing *Standard Fusee*, 940 N.E.2d at 812 n.1). But under Indiana's Appellate Rules, the Indiana Court of Appeals' opinion survives only if it is "expressly adopted or incorporated by reference by the Supreme Court," or "summarily affirmed by the Supreme Court." Ind. App. R. 58(A). The Indiana Supreme Court did neither of those in *Standard Fusee*. *See* 940 N.E.2d 810, 812 (noting that the grant of transfer "vacat[ed] the opinion of the Court of Appeals" under Rule 58(A)).

10

lease do not meet the "substantial entry-level burden" of coercion required to constitute a "suit" under the policies. *Dana*, 690 N.E.2d at 294. As there was no "suit" initiated involving Thompson Thrift, Cincinnati's duty to defend was not triggered, and Cincinnati is entitled to summary judgment on this issue.

### B. Duty to indemnify and umbrella coverage

Thompson Thrift argues that, even if there is no duty to defend, Cincinnati owes it a duty to indemnify "those sums that the insured becomes legally obligated to pay as damages." Dkt. 62 at 35–36; dkt. 56-1 at 64, 311, 1864. Cincinnati responds that the duty to indemnify cannot apply when there is no duty to defend, and that Thompson Thrift was not obligated to pay damages. Dkt. 69 at 27–31.

Thompson Thrift has paid environmental cleanup costs and legal costs incurred in response to the PCE contamination and during its VRP participation. *See* dkt. 62 at 25; dkt. 75 at 19–22. But the indemnification provision requires Cincinnati to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Dkt. 56-1 at 64, 311, 1864. Thompson Thrift does not point to any legal requirement to incur its cleanup or legal costs, or to join the VRP. *See* dkt. 62 at 25; dkt. 75 at 19–22. And while Thompson Thrift argues that it faced strict liability under Arizona law, it provides no authority showing a "legal obligation" to incur costs to avoid that liability, as required for the duty to indemnify. *See* dkt. 62 at 25; dkt. 75 at

11

19–22.  Similarly, Thompson Thrift does not contend that there was any allegation of strict liability made against it.  *See* dkt. 62 at 25; dkt. 75 at 19–22.

In sum, because Thompson Thrift has not designated evidence from which a reasonable juror could find that it was legally obligated to pay damages, Cincinnati is entitled to summary judgment on the duty to indemnify claim.[4]

For the same reason, Cincinnati does not owe coverage under Thompson Thrift's umbrella policies, which Thompson Thrift argues would "provide first dollar coverage" if the CGL policies did not apply.  Dkt. 62 at 36.  The umbrella policies cover "the 'ultimate net loss' which the insured is legally obligated to pay as damages."  Dkt. 56-1 at 128, 384, 1942, 7923.  Since Thompson Thrift has not designated evidence that it was legally obligated to pay damages, the umbrella policies do not apply here either.  Cincinnati is also entitled to summary judgment as to the umbrella policies.

**C. Breach of contract**

Thompson Thrift alleges that Cincinnati breached the Policies by failing to defend and indemnify Thompson Thrift.  Dkt. 62 at 38.  Because, as explained above, Cincinnati did not have a duty to defend or indemnify Thompson Thrift, Cincinnati is entitled to summary judgment on the breach of contract claim as well.

---

[4] The Court therefore does not address Cincinnati's argument that the duty to indemnify cannot apply when there is no duty to defend.

# IV.
# Conclusion

Cincinnati's motion for summary judgment is **GRANTED**. Dkt. [68].

Thompson Thrift's motion for partial summary judgment is **DENIED**. Dkt. [56].

Final judgment consistent with this order will issue by separate entry.

**SO ORDERED.**

Date: 9/23/2025

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel